AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>4160 Sylvan Drive, Dayton, Ohio 45417 including any outbuildings, garages, or sheds located on its curtilage. | ) ) ) ) ) ) ) Case No. 3:22-MJ-368 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the ___Southern___ District of ___Ohio___, there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846 and 841(a)(1) | Possession with the intent to distribute and to distribute controlled substances and conspiracy to commit the same. |

The application is based on these facts:
SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Robert Buzzard*
Applicant's signature

Robert Buzzard, FBI SA
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___Telephone___ *(specify reliable electronic means)*.

Date: 11/1/22

City and state: Dayton, Ohio

Peter B. Silvain, Jr.
United States Magistrate Judge

**AFFIDAVIT IN SUPPORT OF APPLICATION**

I, Robert Buzzard, hereby duly sworn, declare and state:

**INTRODUCTION**

1. I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI"), assigned to the Cincinnati Division, Dayton, Ohio Resident Agency. I therefore am an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 21 U.S.C. § 878. Moreover, I am an "investigative law enforcement officer" within the meaning of 18 U.S.C. § 2510.

2. I have served as an FBI SA since January 2002. I am currently assigned to the Cincinnati Division, Dayton Resident Agency and serve on the FBI's Southern Ohio Safe Streets Task Force (SOSSTF). Since 2002, I have participated in investigations involving narcotics trafficking and have received specialized training on the subject of narcotics trafficking and money laundering from the FBI. I have been personally involved in investigations concerning the possession, manufacture, distribution, and importation of controlled substances, as well as methods used to finance drug transactions. Based on my training and experience – including my participation in the investigations referenced above – as well as discussions and interactions with other experienced FBI SA's, Task Force Officers ("TFO"), and narcotics investigators, I am familiar with the manner in which drug traffickers and their organizations operate within the United States. Based on my aforementioned training and experience, I am familiar with the modus operandi of persons involved in the illicit distribution of controlled substances and as a result, knows the following:

a. It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers and beeper/pager services by using other person's names in order to avoid detection by law enforcement officials.

b. It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution, and use "nominees" to obtain telephone service, utility service, and other services to hide the true identity of the owner or person who will use that service.

c. That drug traffickers often place assets in corporate entities in order to avoid detection of those assets by law enforcement officials.

d. It is common practice, that even though these assets are in nominee names, drug traffickers will continue to utilize these assets by exercising dominion and control over them.

e. It is common practice that drug traffickers possess large amounts of U.S. Currency in order to finance their ongoing illicit drug business.

f. It is common practice that drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs. Drug traffickers commonly front (provide drugs on consignment) to their clients. The books, records, receipts, notes, ledgers, and other documents are kept where the drug traffickers have ready access to them.

g. It is common for drug traffickers to provide false information to law enforcement officials regarding their identity and the address of their actual residence.

h. That persons involved in drug trafficking conceal from law enforcement in their residences, vehicles, and businesses the following items: drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to the acquisition and concealment of large sums of money resulting from drug trafficking activities.

i. When drug traffickers amass large proceeds from the sale of drugs, they attempt to hide the true source of these profits, otherwise known as laundering the money. To accomplish this, drug traffickers many times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's checks, money drafts, and letters of credit. Other entities used to launder drug proceeds include real estate firms and purported legitimate business fronts.

j. Drug traffickers commonly travel to facilitate their trafficking activities. After purchasing drugs, traffickers commonly transport, or cause to be transported, drugs to areas in which they will be distributed. Common methods of transportation include, but are not limited to, commercial airlines, and rental/private automobiles.

k.     It is common practice that drug traffickers commonly maintain books and similar documents which reflect names, addresses, and/or telephone numbers of their associates in the drug trafficking organization. This information can often be stored in cellular phones in places such as the contacts list.

l.     Drug traffickers often take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences and/or businesses of drug traffickers. Photographs such as these can commonly be found and stored in cellular phones.

m.     Drug traffickers commonly have in their possession, (that is on their person, at their residence, and/or their business) weapons, including firearms of various types. Firearms are used to protect and secure a drug trafficker's property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

n.     Drug traffickers frequently maintain hidden compartments within their residence and vehicles to hide drug trafficking evidence (money, ledgers, drugs, etc.), bury evidence in containers such as shoe boxes, or hide the evidence in safes.

o.     The exact quantities, prices, dates, and methods of delivery of drugs are seldom discussed in detailed terms over the telephone. These details are usually agreed upon during face-to-face transactions. For this reason, most telephone conversations regarding drugs are very brief and often in code, understood by the traffickers and designed to mislead or confuse non-participants of the conversations. Drug traffickers make extensive use of cellular phones and text messaging beepers/pagers to facilitate contacting one another. When calling a beeper or text messaging, traffickers commonly input the number that should be called and sometimes add additional instructions in the form of additional digits. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers. The wholesale distributors often have more than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors. The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his closest associates. Most of the drugs, as well as diluting and packaging materials and weighing equipment, are usually kept at the "stash house." Only those amounts needed for immediate sale are usually kept at the point of sale.

p.     Drug traffickers frequently use rental vehicles for everyday travel and will maintain another vehicle, usually at an out of sight location, to facilitate their drug trafficking business.

    q.    Evidence of past communication between drug traffickers can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone.

    r.    I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a "money phone." The money phone is used primarily to communicate with those customers. The customers will subsequently call the trafficker on that cellular telephone number to arrange a purchase of drugs as needed. The trafficker will many times field calls from several customers at once, and then direct all those customers to travel in their car to a designated meeting point. Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then drive away.

## PURPOSE OF AFFIDAVIT

3.    I make this affidavit in support of an application for a search warrant for the following residence – namely:

    a.    4160 Sylvan Drive, Dayton, Ohio 45417, including any outbuildings, garages, or sheds located on its curtilage (hereinafter "**Sylvan house**"). **Sylvan house** is described more fully in Attachment A, which is incorporated herein by reference.

4.    As detailed more fully below, I submit that there is probable cause to believe that evidence of a crime as well as contraband, fruits of a crime or other items illegally possessed in relation to the following offenses exist and can be found inside the **Sylvan house**– namely:

    a.    Possession with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, § 841, and

    b.    Conspiracy to Possess with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, § 846.

5.    A list of specific items to be seized from the premises described above is attached hereto as Attachment B, and Attachment B is incorporated herein by reference. Based on my training and experience as well as the facts contained in the affidavit, I believe that there is probable

cause to believe that the items listed in Attachment B will be found at/in the premises described above. I have not included every detail of the investigation, but only information necessary to establish probable cause that evidence associated with above-described drug trafficking offenses is located at the **Sylvan house**.

## PROBABLE CAUSE

6. In June of 2022 and continuing thereafter, myself and members of the FBI's Southern Ohio Safe Streets Task Force (SOSSTF) began investigating LARAMIE LAWSON for possessing and distributing large quantities of methamphetamine, cocaine, and fentanyl in the Dayton, Ohio area after receiving information from a Confidential Source (CS) indicating LAWSON was in possession of large quantities of narcotics at his residence, the **Sylvan house**. CS has previously provided truthful and reliable information to me, which has been corroborated by independent investigation. CS is providing information to law enforcement for judicial consideration. CS had personal knowledge LAWSON stored large quantities of narcotics inside the **Sylvan house** along with firearms. CS reported LAWSON utilized a black Cadillac sedan, which I verified parked at the **Sylvan house**. I verified this in early June 2022.

7. A background check on LAWSON revealed he is a convicted felon with convictions in Montgomery County Common Pleas Court for firearms offenses and Miami County Common Pleas Court for failure to comply with order or signal of a police officer. In addition, I learned LAWSON was encountered by law enforcement officers on January 11, 2021, at the Cincinnati/Northern Kentucky International Airport. LAWSON was in possession of $19,580 in U.S. currency concealed in his carry-on bag. LAWSON was found to be traveling on a one-way ticket to Los Angeles, California, which he purchased one day prior to travel. LAWSON reported he was not employed and could not explain where he acquired the money. The United States

currency was seized administratively. I know through my training and experience that California is a source state for narcotics transported and sold in Ohio.

8. In July of 2022, I learned through CS that LAWSON was utilizing a residence at 950 Stolz Avenue, Dayton, Ohio as a stash house for narcotics. Task force members subsequently conducted surveillance at 950 Stolz Avenue and observed LAWSON coming and going from the residence and conducting what appeared to be a hand-to-hand narcotics transaction with an individual in the front of the residence before leaving in the black Cadillac sedan. Additionally, task force members utilized CS to conduct two controlled purchases of narcotics from LAWSON at 950 Stolz Avenue, Dayton, Ohio in July 2022.

9. On July 27, 2022, task force members obtained and served search warrants for LAWSON'S residences at 950 Stolz Avenue and the **Sylvan house**. These search warrants were authorized by Judge Richard Skelton of the Montgomery County, Ohio Court of Common Pleas. LAWSON was present inside 950 Stolz Avenue during the execution of the search warrant along with at least four other individuals. The other individuals present indicated to law enforcement officials they were at 950 Stolz Avenue to visit LAWSON. They stated the residence belonged to him. During the search of 950 Stolz Avenue, task force members located and seized bulk amounts of methamphetamine weighing over 14,000 grams, approximately 9 grams of fentanyl, and 5 grams of cocaine. In addition, digital scales and packaging equipment were seized inside the residence, which is indicative of distribution. Possessory items which included a Spectrum bill listing the account name LARAMIE LAWSON at 950 Stolz Avenue was also found inside the residence as well as two loaded handguns. A furniture receipt in the name of LAWSON at the **Sylvan house** was also found inside 950 Stolz Avenue.

10. During the search of the **Sylvan house**, task force members located and seized several baggies containing fentanyl with a combined net weight of approximately 500 grams, multiple digital scales, empty kilogram wrappers, a 20-ton drug press, and possessory items to include: an AES Ohio bill in the name of LAWSON at the **Sylvan house**. Additionally, task force members located and seized a loaded handgun inside the residence. Following the search warrants on July 27, 2022, LAWSON was released pending the submission of suspected narcotics to the Miami Valley Regional Crime Laboratory for analysis.

11. In early October 2022, CS reported that LAWSON was again selling narcotics from the **Sylvan house**. Additionally, during the week of October 10, 2022, the Dayton Police Department received a tip through Crime Stoppers reporting LAWSON was selling heroin from the **Sylvan house**. The tipster reported multiple subjects coming and going from the residence at all hours of the day and night and indicated LAWSON was selling heroin. The tipster also reported LAWSON drove a black Cadillac.

12. On October 25, 2022, FBI Task Force Officer Dustin Phillips conducted a trash pull at the **Sylvan house**. Task Force Officer Dustin Phillips has been employed at the Dayton Police Department for fifteen years. He is also assigned to the FBI SOSSTF. He has been trained in the smell of burnt and raw marijuana and has seized numerous amounts of the same. At the time of the trash pull, the **Sylvan house** trash receptacle was positioned on the public alleyway behind the residence for collection by waste management officials. There were no other trash receptacles in or around the Sylvan house premises. Inside the trash receptacle law enforcement located and seized two large plastic vacuum sealed style bags. Both bags were cut open along the top. One of those bags possessed a strong odor of marijuana and contained marijuana. The other matching bag did not contain marijuana. Additionally, law enforcement located a third plastic bag inside the

receptacle with multiple corners torn off.   I know through my training and experience that drug traffickers utilize the corners of plastic baggies to package narcotics for re-sale.   On the morning of the trash pull the black Cadillac LAWSON is known to drive was parked at the **Sylvan house**.

13. On October 25, 2022, a federal arrest warrant was obtained for LAWSON in case number 3:22-MJ-354 and charged him with drug and firearms offenses.

14. On October 31, 2002, I conducted a spot check at the **Sylvan house** and observed the black Cadillac LAWSON is known to drive parked there.

15. As discussed above, it is apparent that LAWSON is a polysubstance drug trafficker.

## CONCLUSION

16. Based on the facts set forth in the Affidavit, I believe there is probable cause that evidence associated with the above listed drug trafficking offenses are located within the **Sylvan house**.

*/s/ Robert Buzzard*
_____
Robert Buzzard
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me on this

_1st_  day of November, 2022.

_____
Peter B. Silvain, Jr.
United States Magistrate Judge

## ATTACHMENT A

**Location 1:** The place to be searched is 4160 Sylvan Drive, Dayton, Ohio 45417, including any outbuildings, garages, or sheds located on its curtilage. 4160 Sylvan Drive, Dayton, Ohio 45417 is a single family residence constructed of red brick and white trim. The numbers "4160" are affixed on the structure to the left of the rear door. 4160 Sylvan Drive, Dayton, Ohio 45417 is further depicted in the following photograph.



## ATTACHMENT B

## PROPERTY TO BE SEIZED

The items to be searched for and seized are evidence, contraband, fruits of crime, and other items illegally possessed, as well as property designed for use, intended for use, relating to violations of 21 U.S.C. §§ 846 and 841(a)(1) including, but not limited to:

A. Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances.

B. Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail and other correspondence.

C. Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking and money laundering.

D. Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

E. Electronic equipment such as surveillance video and related equipment, pagers, computers, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios, money counters.

F. United States currency, precious metals, coins, bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

G. Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

H. Indicia of occupancy, residency, and/or ownership of the premises and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, and vehicle registrations.

I. Illegal drugs, including but not limited to methamphetamine and fentanyl and other materials, paraphernalia and/or equipment and tools used in the drug trade.

J. Firearms and ammunition.